THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HUSTON SMITH, Defendant-Appellant.

First District (2nd Division)   No. 61437

Opinion filed March 1, 1977.

Reilley, Bell & Weinberg, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago, for the People.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Defendant, Huston Smith, shot and killed Lafayette McIntosh, the boyfriend of defendant's ex-wife, Ella Smith. Defendant was charged by indictment with the offense of murder in violation of section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1971, ch. 38, par. 9—1). Upon a bench trial defendant was found guilty as charged. Judgment was entered on the finding and defendant was sentenced to serve a term of confinement of 14-20 years in the Illinois State Penitentiary.

From entry of the judgment of conviction defendant appeals contending (1) that the trial court erroneously excluded certain testimony concerning defendant's mental state at the time of the offense; and (2) that the evidence properly adduced at trial was insufficient to establish his guilt beyond a reasonable doubt.

A review of the facts reveals that on March 25, 1973, at approximately 12 noon, defendant arrived at the home of his former wife, Ella Smith, for the purpose of visiting their seven-year-old daughter, Benita. Decedent, Lafayette McIntosh, who occasionally resided at the house, was in the bedroom where he briefly met with and privately spoke to defendant. As defendant and his daughter prepared to depart, Ella Smith requested that defendant return the child to the nearby home of Mrs. Smith's sister, Ester Watkins, where a birthday celebration was planned for the evening. Prior to the date of the incident, defendant had occasionally resided at the Watkins' home and certain of his personal belongings had been stored there.

Defendant and his daughter arrived at the house at approximately 5:30 p.m. Also on the premises at this time were decedent, Ella Smith, Watkins, and several mutual acquaintances including Jesse Greenwood, Lee Taylor, Ernest Charley, and Johnny and Patricia Wingard.

Shortly after his arrival, defendant had occasion to observe that his daughter was limping due to a "gash" on her toe. A discussion ensued between defendant and Ella Smith concerning their respective responsibilities for securing medical treatment for their injured daughter. Defendant refused to personally transport her to hospital facilities citing a lack of proper knowledge of his daughter's medical history, but offered to supply transportation and agreed to bear the cost of any treatment. Ella Smith initially refused defendant's offers.

According to defendant, decedent then joined the conversation and told defendant that it was his responsibility to take the child to the hospital. Defendant responded, "I don't want you telling me these things man. I don't have to listen to your B.S." Defendant testified that decedent then proffered the opinion that the child was "brainwashing" defendant into taking her to the doctor, threatened that he was "going to start teaching her how to act," and to effect this goal was going to "whip her ass and yours [defendant's] too."

Defendant purportedly pleaded with decedent that he refrain from taking such action and inquired, "Lafayette, can't we talk this over." Decedent purportedly informed defendant that in his opinion there was nothing to discuss and that "I am taking your place." Defendant rejoined, "why don't we let the court decide who is taking whose place?" Decedent allegedly responded, "Houston, I am the Court, the Judge, and the damn Jury."

At this point the conversation terminated. According to defendant, decedent walked to Ester Watkin's automobile, removed something from the glove compartment, and put it in his pocket. Defendant testified that he believed decedent had armed himself. Defendant left the vicinity and drove to his place of business in Robbins, Illinois. Decedent and Ella Smith also departed to transport Benita to the hospital in Watkins' vehicle.

Ella Smith and decedent returned to the Watkins' home at approximately 8 p.m. Defendant joined them at 8:30 p.m. and entered a rear bedroom where he recovered certain personal effects, some money and a loaded .38 revolver. Defendant placed the gun in the right rear pocket of his trousers and underneath a three-quarter length coat he was wearing. Defendant testified that during this period he overheard Ella Smith recounting to Watkins that defendant had refused to transport Benita to the hospital, that decedent and defendant had argued and that Ella Smith was "going to let him have it out."

Defendant sought to speak to Ella Smith in private and to this end entered the living room of the house. However, his plan was interrupted when he and Ella Smith were joined by decedent, Watkins and Patricia Wingard. Defendant testified that during this time decedent approached defendant and proceeded to follow defendant about the room. Neither Ella Smith nor Watkins observed decedent "chase" defendant in this manner.

Defendant positioned himself at the front door of the house and stood facing its interior and the people in the living room. Defendant asked decedent where certain judicial processes should be sent which, according to defendant, would restrain decedent from effecting his threats to injure defendant and his daughter.

According to Watkins, decedent took one or two steps toward defendant and said, "Man, you don't know me, you don't have anything to beef at me about."

Defendant testified that he warned decedent not to come any closer. Defendant further testified that decedent asked, "What is the matter Houston? Are you afraid of me?" Defendant responded in the affirmative. It was established that defendant was five feet, eleven inches tall and weighed 175 pounds at the time of the incident. By comparison, decedent stood six feet, five inches tall and weighed 205 pounds.

Defendant stated that decedent then said, "You are a dead MF, you're dead. I hope you got your shit, and if you got it you had better use it." Patricia Wingard denied that any conversation occurred following defendant's initial warning to decedent that he not come any closer.

Defendant testified that decedent "rushed his right hand into his pocket" whereupon defendant drew his weapon. Lee Taylor, who had previously entered the house, testified that he heard a "click" and

believed that defendant inspected the firing mechanism of his weapon. The gun then discharged harmlessly into the ceiling. Watkins testified that she observed defendant's hands and the gun entangled in defendant's coat immediately prior to the initial discharge. Taylor also observed that a portion of defendant's coat was around the revolver. Defendant testified that he intentionally fired the round to permit himself an opportunity to leave the room.

At the time of this shot, decedent stopped and stood at a distance of five feet from defendant. Thereafter, decedent turned and took one or two steps toward the interior of the house.

According to defendant, Watkins ran to him and seized his arm and wrist while Ella Smith also rushed to him and struck his left side. During the ensuing struggle, two additional rounds were fired, according to defendant, because "the gun just started going off." Defendant indicated that Watkins "put her hand on the barrel of the gun and my hand," pulling the gun downward at which time the gun discharged for the second time. When the women released him, defendant testified that he then observed decedent on the floor.

Watkins testified that after the first shot into the ceiling, she observed defendant "lower his gun" and discharge another round. At this point she observed decedent throw up his hands in front of his throat, turn and head toward the rear living quarters. According to Watkins, she then approached defendant, pleaded with him not to shoot, and put her hand on his shoulder. Another round was discharged and she observed decedent fall to the floor. Defendant then fled from the house through the front door and disposed of his weapon in a garbage can. It was never recovered.

The decedent was found to have been unarmed. A total of four spent bullets were subsequently recovered from the interior of the Watkins' home. It was stipulated that McIntosh died of a gunshot wound which entered his back, pierced his heart and lung, and exited through his chest. No evidence appears of record as to the physical stature of Watkins or Ella Smith.

During the course of trial proceedings, defendant steadfastly maintained that he was not guilty of murder because the death was unintentional and accidental. This position was rejected by the trial court, and defendant does not seek to resurrect it on appeal.

Instead, defendant asserts that he was not proven guilty beyond a reasonable doubt since, (1) the court failed to make a specific determination as to defendant's intent at the time of the shooting; (2) sufficient evidence of self-defense was introduced to raise a reasonable doubt as to defendant's guilt; and (3) other exculpatory evidence was erroneously excluded by the trial court which evidence would aid in

establishing defendant's fear for his life at the time he drew his weapon and fired the initial shot. Alternatively, defendant urges that this court reduce defendant's conviction to the lesser included offense of voluntary manslaughter based upon an asserted unreasonable belief that decedent was armed and intended to do defendant harm.

■■ The State correctly points out that the intent necessary to constitute the offense of murder may be inferred from the character of the assault and the attendant circumstances. (*People v. Muldrow* (1975), 30 Ill. App. 3d 209, 332 N.E.2d 664.) The trial court, in making its finding, expressly recited this well-settled principle and noted that a sane man is presumed to intend all the natural and probable consequences flowing from his own deliberate act. (*People v. Carter* (1951), 410 Ill. 462, 102 N.E.2d 312.) The court's finding was adequate in this regard.

Nor can it be said that the trial court was without sufficient evidence upon which to render such a finding. No evidence was introduced, nor did defendant seek to introduce, evidence that at the time defendant's firearm discharged the fatal shot, defendant was acting in self-defense. To the contrary, defendant testified that the shots which killed decedent were fired because the gun "just started going off" apparently in conjunction with defendant's struggle with Watkins and Smith.

■■ This version was substantially contradicted by both Watkins and Smith who testified that defendant discharged his weapon after the initial shot and prior to their approaching defendant. Moreover, testimony that at the time the fatal shot was fired decedent was unarmed, had broken off his dispute with defendant, and was in the process of retreating when felled by defendant's bullet simply cannot be discounted. Nor can we ignore the fact that defendant returned to the scene after a heated argument with decedent and armed himself. Upon such evidence, the trial court properly found that Lafayette McIntosh's death was not accidental, but rather the result of defendant's intent to kill him or do great bodily harm to his person.

Defendant sought to introduce at trial evidence as to his mental state at the time that he drew his revolver and fired the initial shot. Defendant made an offer of proof, in part, as follows:

> "Q: What was your mental state when you fired into the ceiling?
> A: I was frightened.
> Q: Frightened of what?
> A: He had his hand in his pocket moving toward me."

The trial court rejected this offer of proof as being immaterial to defendant's defense of accident.

■■ We do not agree that such evidence was utterly without probative value in the case at bar. The circumstances under which the act in question (*i.e.*, fatally shooting McIntosh) was done usually to serve to manifest to a

great degree an intent of the actor and may overcome any declaration as to his intent. However, the actor has the right to testify as to his intention and to have the circumstances surrounding the act considered in connection with his testimony. The weight to be accorded such evidence is for the trier of fact. (*People v. Smalley* (1973), 10 Ill. App. 3d 416, 294 N.E.2d 305.) The trial court erred in rejecting defendant's offer of proof.

■■ However, such error does not mandate reversal of defendant's conviction. It remains uncontroverted that no evidence was offered or introduced to establish that defendant's actions in fatally shooting McIntosh were in self-defense. No evidence was offered or introduced that at the time the fatal shot was fired defendant was in fear of his life, reasonably or otherwise, from the person of decedent. Evidence adduced at trial simply presented the question of whether defendant's firing of the second, third, and fourth shots was intentional or accidental. As previously noted, the determination of the trial court in this regard was proper.

While defendant's reason for drawing his revolver cannot be said to be irrelevant to the issue of defendant's guilt, it similarly cannot be maintained that defendant was wholly prevented from presenting such evidence to the court. Aside from his offer of proof, defendant was permitted to testify that he believed decedent to be armed, that he vocalized his fear and warned McIntosh not to approach, and that he fired the first shot to permit himself the opportunity to flee the premises after being verbally abused by decedent. Defendant's appellate theory of self-defense is incompatable with that at trial as to his mental state just prior to decedent's demise. Defendant's drawing of his weapon may be explained as being motivated by self-defense and evidence may be adduced to support this position. However, that is not to say that his subsequent use of such weapon to shoot and kill a retreating and unarmed victim is similarly sufficient to justify defendant's misconduct and discharge him from penal liability. See *People v. Thomas* (1972), 8 Ill. App. 3d 690, 290 N.E.2d 418; *People v. McNair* (1975), 30 Ill. App. 3d 603, 332 N.E.2d 696.

For the aforementioned reasons the judgment of the circuit court is affirmed.

Affirmed.

DOWNING, P. J., and PERLIN, J., concur.